## *Eaton *v.* Berlin.*

The consideration or equivalent for state aid, was actual service in the army of the United States, under an enlistment in some town, city or place of the state, where such service was rendered.

Such was the requirement of the law after the act of July 9, 1862.

Negotiable papers, signed by *agents* without *authority* of *law*, are not valid in the hands of any one.

The party discounting such paper, is bound to inquire at his peril, whether it was signed by a party, capable and competent in law to bind himself, or by an agent duly authorized to bind his principal. Also, whether the party, from whom he receives such paper, was competent to make the transfer, either in his own right, or is authorized to do it for his principal, for whom he assumes to act.

Such paper is liable to the same defence in the hands of an indorsee, as it would be subject to, in the hands of the original promisee.

Generally, where a corporation has legal power to issue negotiable securities, the *bona fide* holder has a right to presume they were issued under such circumstances, as will give them the requisite vitality; and in such cases they are no more liable to be impeached for any infirmity in the hands of such a holder, than any other commercial paper. The order in fact, though negotiated for value, not having been authorized by law, is open to defence, and this legal infirmity can be shown.

In order that such an instrument be good as commercial paper, it must be for the payment of money only, and absolutely, and not upon any contingency, either as to amount, event, fund, or person.

In this case, the order was drawn on a specific fund, which under the law was not in existence, and as to the parties, at the time it was drawn, had utterly failed, and it was to be used as a mere voucher by the original parties thereto, and there was enough on the face of it, to put the parties on inquiry.

---

*This opinion was not published in Vol. 48, not having been seasonably furnished to my predecessor.　　　　　　　　　　　　　　　Reporter.

THIS is an agreed case—in an action of assumpsit by George R. Eaton against the town of Berlin, upon an order, of which the following is a copy:

$144. To Dexter Wheeler, treasurer of the town of Berlin for the year 1865: Please pay Richard Perkins, or order, one hundred and forty-four dollars in full for state aid, from May 1st, 1864, to May 1st, 1865, and this shall be your voucher for the same. Berlin, May 29th, 1865.

F. I. BEAN,          } Selectmen of
J. W. WHEELER,   }   Berlin, 1865.

And said order is endorsed as follows:

*Witness*, G. R. EATON.                    RICHARD $\overset{\text{his}}{\underset{\text{mark.}}{+}}$ PERKINS.

Accepted, June 14, 1865.

DEXTER WHEELER, *Town Treasurer.*

From November, 1863, to the present time, said Richard Perkins has been a resident of said Berlin. From November, 1863, to the close of the war, he had a son by the name of Elliot Perkins in the service of the United States, in a Maine regiment, and said Richard Perkins claimed state aid from said Berlin on account of his son. The selectmen of Berlin sent to the state treasurer of New Hampshire, and he allowed and sent to them the state aid for said Perkins, from February, 1864, to May, 1865, and they paid it over to said Perkins. It was allowed for said Perkins, his wife and one child, at twelve dollars per month. In May, 1865, said Perkins claimed state aid for the year then passed, and the selectmen, supposing that it was right and that he should have it, for the reason that it had been paid, as before stated, by the state treasurer, drew the said order, and delivered it to said Perkins, and he soon afterwards sold it to the firm of H. Winslow & Co., who paid for it, and after that it was accepted by the treasurer, and it is now sued in the name of said Eaton for said company. Before said order was purchased, said Eaton, as agent of said company, asked one of the selectmen of Berlin if the order was all right and was told that it was. Upon application to the state treasurer of New Hampshire, he decided that state aid was not due to said Perkins from this state, for the reason that his son was in the service of another state. Said town, therefore claims that said order was without consideration, and that there should be judgment for the defendant. It is agreed that the questions of law arising upon the foregoing statement of facts shall be transferred, and upon a decision being made thereon, either party may have the case discharged, and have a trial by the jury.

It was ordered, that the questions of law arising on the foregoing statement, be reserved, and assigned to the law term.

*Fletcher & Hayward*, for plaintiff, referred the court to the several acts of 1862 or 1864, to show that the parents of the soldier were not entitled to State aid, the son enlisting into and performing military duty in the service of the United States, in behalf of the state of

Maine.   To show that no action could be maintained upon a town order of this kind, they quoted *Smith* v. *The Inh. of Cheshire,* 13 Gray. 318.

*Ray & Ladd,* for defendant commented on the aforesaid acts of the State, and also insisted that the town was estopped by the acts of their agents from inquiring into the consideration, upon which the order was given, as against this plaintiff, and cited Angell and Ames on Corp. 238 ; *Goodman* v. *Eastman,* 4 N. H. 455.

NESMITH, J.   By comparing the provisions of the second section of chapter 2584 of the Pamphlet Laws, passed July 9, A. D., 1862, with the second section of chapter 2864, made and passed, July 16, A. D., 1864, it is made quite plain, that no town or city in this state had any power or right to raise or apply money, as state aid, for the family and dependents of any person who had been enlisted and duly mustered into the service of the United States, as a part of the *quota* of any other state, after the date of July 9, 1862, when that statute went into effect.   Our towns and cities may legally have furnished such state aid to such families or dependents of such soldiers enlisting before July 9, 1862, agreeably to the provisions of chapter 2480 of July 4, 1861, but it seems to us that the legislature evidently intended by the express terms of the aforesaid acts of 1862 and 1864, before referred to, that our towns, cities or state should not be burthened with the support of the family or dependents of any person who had been enlisted and mustered into the service of the United States, and who had made or constituted a part of the quota of another state after the aforesaid date of July 9, 1862.   No legal obligation could rest upon the town, city or state to furnish such aid, unless upon the consideration of some equivalent to be derived from the service of the soldier.   The enlistment of Elliott Perkins into the Maine regiment was in November, 1863, and long after Congress by its enactments had apportioned to each state its just quota of troops to be furnished, and after the authorities of our own state had apportioned to each and every town, city and place its quota, to be by it respectively furnished, and it appears evident to us that the enlistment of Perkins into the Maine regiment could not be credited either upon the town or state quota, so as to reduce the *number* of troops the town of Berlin and this state were relatively required to make up.   Therefore he cannot call for state aid, either for his family or dependents, because the law giving him such relief was in terms repealed long before his enlistment.   The selectmen of the town of Berlin had therefore no legal authority to pay money of the town for such aid, much more to draw their order in behalf of any person upon the treasurer of the town, or upon the treasurer of this state, for remuneration or indemnity.

Such orders would be without authority of law, as between the original parties thereto, and the chief important inquiry is here, whether such paper is *negotiable,* so as to enable an indorsee for value to recover the

contents of the paper of the defendant town? We may properly admit that the plaintiff Eaton has the same rights that the plaintiff, in interest, Winslow & Co. would have if the suit had been in their names. The doctrine is stated clearly in *Clarke* v. *Pease*, 41 N. H. 423, that generally promissory notes or other negotiable paper, signed by *agents* without authority of law, are not valid in the hands of any one. The party who discounts such paper is bound to inquire, at his peril, whether the note offered to him is signed by a party capable and competent in law to bind himself, *or by an agent duly authorized to bind his principal*. Besides this, he is bound to inquire, whether the party, from whom he receives it, is *competent to make the transfer* in his own right, or is authorized to do it for his principal, for whom he assumes to act. If there is a failure upon either of these points of capacity or authority, it will not avail the party, that he is a *bona fide* holder for value without notice. The holder in such cases must look to his *indorsee*, if he has one; and if he has none, he must suffer the loss. Such is the general rule. Angell & Ames on Corp. 213 & 246. Parsons on Notes and Bills, 1 vol. 119, sustains the same principle. His language is, if an *agent* exceeds his authority in signing the name of his principal to a note, such note will be void as to the principal, even in the hands of a *bona fide* holder. Parsons quotes *Fearn* v. *Felicia*, 7 Manning & Granger 513; *Andover* v. *Grafton*, 7 N. H. 298; *Mechanics' Bank* v. *The New York & New Haven R. R.*; 3 Kernan 631. In the latter case, Comstock, J., says: It is obvious that *negotiability* can impart no vitality to an instrument executed under a power where the agent has exceeded his actual or presumptive authority, whoever proposes to deal with a security of any kind, appearing on its face to be given by one man for another, is bound to inquire, whether it has been given by due authority. And if he omits that inquiry, he deals at his peril.

In *Andover* v. *Grafton*, Judge Parker, speaking of a promissory note, signed by an agent, or a selectman, without due authority, remarks, that if an indorsee should take such a note even before it became due, he would receive *it*, subject to a liability to make the same proof respecting the authority of the selectmen to execute it in that particular case, as would be required of the *promissee*, and of course must be chargeable with notice of all the *facts*, and the note in the hands of the indorsee would be liable to the same defence, as it would be in the hands of the original promissee. Such must be regarded the reasonable rule to govern this class of securities. Now, if full and due inquiry had been made by the purchasers of this order, previous to its transfer to them, into its origin and history and the *legal authority* of the public agents, that issued it, they probably would have learned that there was no legal right on the part of the Perkins' family to receive state aid, and of course no right on the part of the selectmen of Berlin to advance such aid, and afterwards to receive any portion of it from the state. When vitality is given to paper of this kind by statute law, such law is to be consulted and obeyed; therefore, when it is issued in violation of

positive law, it of course will generally be regarded as void in its inception and ever afterwards. The elementary rule applies to this instrument as to due inquiry; that whatever is notice enough to excite attention, and put the party on his guard, and to call for inquiry, is notice of everything to which such inquiry would naturally have led. It seems to us that inquiry by the indorsees of one of the selectmen, and his announcement that it was all right, does not show such previous inquiry as the circumstances actually required. *Gould* v. *The Town of Sterling*, 23 N. Y. 150. The general rule as laid down in this case, does not conflict with the doctrine in *Great Falls* v. *Farmington*, 41 N. H. 42; because it distinctly appeared there that the selectmen of Farmington had authority conferred by law to contract for the liquor, which constituted the consideration of the note in suit in that case, and it was expressly made the duty of the towns, as the law then stood, to appoint agents, for the purpose of purchasing and vending for certain purposes spiritous liquors, within their several cities and towns; and selectmen were in fact made liable to indictment for refusing to appoint such agents. *State* v. *Woodbury*, 35 N. H. 230. Hence it was held that the selectmen of Farmington might legally purchase upon the credit of the town, the liquors necessary to supply the town agency, which they were required to establish. As the town was legally liable to furnish such agency with suitable liquors, then their credit might be pledged to procure them; and the selectmen of the town, as the general, prudential or financial agents of the town, might rightfully bind the town by a note given for the price of such liquors as were necessary for that purpose.

We do not intend to restrict the power usually and commonly exercised by our respective town officers and financial agents, where their powers are conferred under positive law or established usage. It is a good general rule that our towns, through their respective officers, can exercise such powers as are expressly granted, and such incidental ones, as are necessary to effectuate the purposes of the occupation, and these powers are to be construed strictly. *Sanborn* v. *Deerfield*, 2 N. H. 251; *Mason* v. *Bristol*, 10 N. H. 36; 2 Kent Com. 298.

The powers and duties of selectmen and their right to bind their towns by the issue of negotiable paper, is fully and ably discussed by Chief Justice Bigelow, in the case *H. D. Smith* v. *Inh. of Cheshire*, 13 Gray 321. The general doctrine advanced in that case is, that no action could be maintained upon a town order, drawn by the selectmen of the town for money payable to the bearer, and accepted by the town treasurer, so as to make the town liable, without *express authority of the town*, in the name of any one, other than the person to whom it was issued. We are not called upon to concide with Ch. J. Bigelow in all his reasoning, but his conclusion seems to be founded on a solid basis. *Tuber* v. *Cannon*, 9 Met. 458; *Paige* v. *Stone*, 10 Met. 168.

There are, also, many cases where express power is given by spec-

ial statutes to municipal and other corporations to issue their notes and bonds generally in form negotiable for particular objects, as stated in the act. Under these statutes, negotiable county, city and town bonds, notes and warrants have been issued. The constitutionality of some of these acts has been tested by decisions in the supreme court of the United States. *Com. of Knox County* v. *Aspinwall*, 21 Howard 539, 24 *Ibid.* 287; *Gilpeeke* v. *Dubuque*, 1 Wallace 203.

In these cases, the doctrine is held by the court that where a corporation has legal power to issue negotiable securities, the *bona fide* holder has a right to presume they were issued under such circumstances, as will give them the requisite vitality, and that in such cases, they are no more liable to be impeached for any infirmity in the hands of such a holder, than any other *commercial* paper.

Where this language was employed, there was an express *specific power* conferred on the city to issue its negotiable bonds for a public object.

Judge Dillon, of Iowa, in the case *Clark* v. *The City of Des Moines*, reported in the Law Register of January, A. D. 1867, has reviewed some of the aforesaid decisions, and collected many authorities bearing upon this subject. He says after a very thorough investigation, that he has not been able to find a case, which holds that city and county warrants or orders like this in suit, are freed from equities, when in the hands of a *bona fide* holder.

He adds, we have found several cases in different states expressly holding, that such *orders* were not *commercial paper* in the hands of an innocent holder so as to exclude evidence, or inquiry into the legality of their issue, or preclude defences thereto. Leading cases on this point are, *Halstead* v. *Mayor of New York*, 5 Barb. 218; affirmed in the Court of Appeals, 3 Com. 430; *People* v. *El Dorado County*, 11 Cal. 170; *Sturtevant* v. *Liberty*, 46 Maine 457, being a suit on a town order like the one in suit; *Dalrymple* v. *Whittingham*, 26 Vir. 345; *Inhabitants* v. *Weir*, 9 Ind. 224; *School District* v. *Thompson*, 5 Minn. (1861;) *Clarke* v. *Polk County*, 19 Iowa 248; then we have *Balfour* v. *Ernest*, 5 Com. Bench N. S. 439, quoted by Judge Redfield with approbation in his judicious commentary upon Judge Dillon's decision. This latter decision is in support of *Sturtevant* v. *Liberty*.

Another defence may be properly urged to the plaintiff's recovery in this case. The defence arises from the peculiar form and character of the order. It was not intended by the parties, as anything more than an authority to obtain a certain amount of money for a particular purpose, specified as state aid; and the paper was to be used merely as a voucher, or as evidence of payment of the amount specified in the instrument. In order that such an instrument be good as commercial paper, it must be for the payment of money only and absolutely, and not upon any contingency, either as to amount, *event, fund,* or person. Chitty on Bills 132.

The order was, in fact, drawn on a specific fund, which, under

the law, did not exist, or as to the parties, at the time it was drawn and which had utterly failed, and there was enough on the *face* of it to put the holder upon inquiry before its purchase. It was to be used as a voucher. *Merriam* v. *Rockwood*, 47 N. H. 81; *Harriman* v. *Sanborn*, 43 N. H. 129, and cases cited.

We think upon either ground plaintiffs cannot recover, and according to the agreement of the parties.

*The case must be discharged.*